Good morning ladies and gentlemen. We have five cases on the calendar this morning. We might actually say six, but there are five. Two cases from the patent cases from the district court, patent case from the patent trademark office, contract case from a board of contract appeals, and a government employee case. The latter two are not being argued, they're being submitted on the briefs. Our first case is Astra v. Apotex and Impacts, 2007-14-14, etc. Mr. Breisblatt. Good morning, your honors. Robert Breisblatt on behalf of Apotex. Apotex's basic position, and the one I'm going to spend my time arguing today, is that there was no infringement. The court in this case, the trial court, found that Apotex does not apply a subcoding in the manufacturing process, and that's significant. Mr. Breisblatt, I don't want to get you off your track here, and you're entitled to argue as you wish, but I'd like to ask you about the clamp construction. I believe you're arguing that the clamp construction is incorrect, clamp construction with respect to acid-label pharmaceutically active substance. You've argued that it has better stability in alkaline conditions is incorrect. Is that your position? That's the position as we argued it in the brief, your honor, and I believe we covered it there. That's correct. Now, even if we agree, does it matter? Well, clamp construction always matters, your honor, and of course, if you agree, then... Is there anticipation with respect to any of the references that you've cited? I believe, as we argued in the brief, there would be, your honor, and therefore, at least as to the acid-label patent, the 230 patent, it would be anticipated or it would have been obvious. Clamp construction actually comes into the non-infringement argument as well, your honor, because the court erred when she failed to recognize that the public notice, when one reads this patent, both patents, they require that the enteric coating not come in contact with the omeprazole core. And she ignored that teaching of the patent in finding that at least as to the Apotex product, there could be an in-situ subcoating. And let me go into that. The trial court found that Apotex, like I said, does not apply a subcoating. She found first that Apotex makes an omeprazole core, and it is a homogeneous core as she describes it. The ingredients are all mixed together. She then found that Apotex applies the enteric coating directly to its pellet cores, to its omeprazole core. When one reads both of these patents in issue, those patents teach time and time again that one of their purposes, one of the inventions here, was to prevent the enteric core from coming in contact with the omeprazole core. That is the essence of the teaching here. Because they teach you that if that occurs, only bad things happen. In other words, you didn't want to tell me which of the references anticipates the claim even as you would like it construed. Back to the court's question on label. I believe it's in our brief, Your Honor, and I don't want to misstate it. And that's why I didn't go directly to it. So be it. But I want to focus, though, on the non-infringement argument. Because frankly, if the court agrees with Apotex, we don't go any further. And even with the label acid, that only takes care of one of the two patents. Isn't that intensely factual? And the court heard all sorts of evidence, and we've got a standard of review here. Infringement is a question of fact. Not again if we go to the concept of the construction of the claim, which the court always has to look at. The only factual disputes became when one attempted to go inside this pellet through the destructive testing of Astra to try and show that there was a sub-coating. One doesn't get to that. If one looks at this patent, this patent says time and time again, the enteric coating is not supposed to come in contact with the omeprazole core. If it does, bad things happen. The prior art, for example, the European patent, the 495 patent, showed exactly what Apotex does. An enteric core, I'm sorry, an omeprazole core with an enteric coating. That's exactly what Apotex did. The patents in issue say if you do that, it's bad. It's not supposed to work that way because you're going to get degradation. You're going to get a reaction. You're going to get discoloration. Apotex and the court found. Her finding is we do exactly that. We have an omeprazole core with an enteric coating. Once she made that finding, there could not be any infringement. All of Astra's destructive testing, and it's all destructive testing, regardless of her factual finding, all of that was destructive testing to try and prove that something was there. We have fluorescent pictures. We have measurements of fluorescence without any kind of controls. It's all been washed away. That is factual, but you don't have to get there. Once she makes her finding that the enteric coating is right on the omeprazole core and one reads this patent, there can't be any infringement. The patent says quite clearly, and it teaches all the way through, not just an example, but when it says what the problem was, one of the problems they're trying to solve is when the enteric coating comes in contact with the omeprazole core. When that occurs, this patent says you have to put a subcoating so that won't occur. Apotex doesn't. She found we don't. What she says is there's a reaction, which is what's not supposed to occur, and that somehow formed in situ a subcoating. I submit that once this court came out with its in-bank ruling in Phillips, and it talked about the public notice, and it said when you look at the claims, you don't look at them in a vacuum. You have to look at what the purpose of the patent is. In this case, once she found that we put an enteric coating directly on that omeprazole core, and there was no dispute about that, she should have found there was non-infringement. Are you saying that's clear error, then? That's clear error, because that goes to her interpretation of the claims. Once she made her factual finding that we put that enteric coating directly on the omeprazole, and you read these patents under public notice and under the reading of the patents and under Phillips, we couldn't infringe. Well, you're not really arguing clear error on that. You're arguing claim construction, right? But that's claim construction. No, that's not. No, I apologize. That's in court's de novo review. Clear error would be if we got into the factual. I've used up my seven minutes, and I'm going to turn it over to Mr. Toney. Thank you. Good morning. Good morning. Jeffrey Toney for Impact Laboratories and the Sutherland Law Firm. Excuse me. I'd like to focus, unless the court would like otherwise, on essentially three issues, each one of which is entirely independent, and each one of which compels either vacation or reversal of the court below. The first is the fact that at the time the court entered its opinion, it lacked subject matter jurisdiction to decide the matter as to Impact Laboratories, because there was no lingering claim of damages. All that remained was requests for injunctive and declaratory relief. The second basis is the utter failure of proof that Impacts infringed the patents, because the undisputed evidence of record in the court below is that Impacts' formulation is not stable and does not have a three-layer formulation. And third, the fact that the invention in question, ASTRA's three-layer formulation, was in public use in an open label, phase three clinical trials, well in advance of the critical date. On jurisdiction, once court is seized of a case, doesn't it have jurisdiction to render judgment on all issues before it? This court and the Supreme Court have repeatedly held that subject matter jurisdiction over patent matters expires with the patent. The exception, of course, is if there is a claim for damages in the case, and in that case, of course, the court retains jurisdiction. What if it's a Lanham Act claim? A Lanham Act claim in what context? Or a copyright claim. Just because the patent expires, jurisdiction doesn't cease if the court was properly, if the case was properly before it? Well, this court, Your Honor, held otherwise in a number of different cases. I'm going to start with the Kearns case. This court held that when you have a case and all that is pending is a question of injunctive relief, when the patent expires, injunctive relief is no longer available. And as a result of that, the claims become new. They can't proceed. What issue are you talking about? Resetting of the FDA clock? Well, I'm focusing on the question of patent term right now. This court has never held that pediatric exclusivity gives lingering federal jurisdiction over patent claims, even after the expiration of the patents. In fact, the court below is the first court I'm aware of that has ever done so. And the other two courts that have addressed the issue, both cited in the brief, Visor v. Milan and the Roche case, in both of those cases, the district court held that once the patent expired, when there's only pending claims for injunctive relief or declaratory relief, or for that matter, an order under Section 271E4A, for an order that the effective date of the end would be a date not earlier than patent expiration. When did these patents expire? These patents expired on April 21 of last year, Your Honor. And six-month pediatric exclusivity would have expired also. It would have expired in October of 2007. In fact, it did expire in October of 2007. But this opinion in the court below was not rendered until late May of 2007, more than a month after the patents expired. But while the pediatric injunction is still in effect? Yes, Your Honor. And wouldn't it have been the case that a decision on invalidity would have terminated the availability of the pediatric extension? If the court below had said that the patent was invalid, that there wouldn't have been any pediatric extension, correct? Subject to whatever post-judgment motion practice. Let's assume that in the hypothetical world, the district court speaks, and that resolves everything. So there was still a dispute between the parties that had real-world effects, correct? I respectfully know, Your Honor. But the real-world effect being an effect on the pediatric extension. What's the technical term for that? Pediatric exclusivity. Exclusivity. Exactly. And it is entirely administrative. But nonetheless, the district court, my question really is, does the district court's decision issued at some point after expiration, but before the end of the period of pediatric exclusivity, have an effect on the period of pediatric exclusivity? It shouldn't. The terms, the plain language of 271E4 are that the only remedies available to the patent holder in a 271E case are the three that are listed. And the order in question is an order that the effective date be made a date not earlier than patent expiration. It doesn't even address the question of pediatric exclusivity. And I would submit it would be improper for the court to reach out into the FDA's domain and make such a determination. For example, the FDA revokes pediatric exclusivity and other exclusivities from time to time. If courts are free to put the effective date of the ANDA at any date in the future they wish, then they're usurping the FDA's power to enforce exclusivity to grant it or to revoke it and otherwise to administer it. Well, the FDA doesn't really grant pediatric exclusivity. They only accept the reports. Once they accept the reports at that point, then the exclusivity starts, doesn't it? I believe, Your Honor, that the FDA initiates the process by requesting the pediatric experimentation and that if it is done and it's proved to be effective and safe in pediatric patients, then they will essentially invoke pediatric exclusivity. But those have to be accepted by the FDA. If they reject the reports, then the pediatric exclusivity doesn't even take place. That's true, Your Honor. They have to accept it in the first instance. But there's ongoing reporting requirements on behalf of all pharmaceutical companies to continue to report, for example, adverse events, and the FDA does from time to time revoke exclusivity. In any event, Congress saw fit to put in the FDA's hands the question of administering exclusivity, deciding when to grant it and when to deny it. Presumably the FDA has to decide whether the product is safe and efficacious for children. That's an approval, right? Yes, Your Honor, exactly. They accept the reports from the pharmaceutical companies establishing that the drug is safe and effective. More than accept them, decide that they are sufficient to establish safety and efficacy, I would presume. Yes, Your Honor, that's what I meant. That's what it's all about. Yeah, exactly. That's what I meant when I said accept it. They pass on the form and the sufficiency of the data, and then they proceed. Was that done here? There's nothing on the record to show that. Your Honor, I'm not privy to the particulars of what was submitted in support of pediatric exclusivity. I just know it was, in fact, granted. So we assume that it was granted on that basis that the reports were filed and they were efficacious? Yes, Your Honor, as of that time, at any rate. However, at the time the court entered its order, pediatric exclusivity was underway, but the patent terms themselves had already expired. I see my time is up. Thank you, Your Honor. Time will see you later. Mr. Taylor? Good morning. You have an uninterrupted period of time, except as interrupted by us. Okay. Good morning. Errol Taylor for AstraZeneca. With me at counsel's table is Larry Cass, Emily Koontz, and Fred Zullo, all from Milbank. I'd like to first attempt to respond to your question to Apotex's counsel regarding the effect on validity. Should this court find that the claim construction of acid labile pharmaceutically active substance was in error? It is AstraZeneca's view that it has absolutely no effect on validity. There were three patents, three prior art patents, that Apotex relied on. In other words, if the claim construction was in error, it was harmless error? Absolutely, Your Honor. We detail in our briefs the number of ways that the references relied on by Apotex did not meet the limitations of any of the claims of the 505 or 230 patent. Apotex tried to apply these references to the 230 patent, but for a number of reasons, including the fact that it did not meet the acid labile pharmaceutically active ingredient limitation in the 230 patent, those references did not anticipate. I'd like to go on to talk and address the infringement issue again raised by Apotex. Now, this court has considered the arguments made by Apotex before. In the first wave case, the first omeprazole trial, the first wave defendant, Hendricks, made this very same argument. The argument that their process to prepare their product doesn't involve a separate sub-coating step. The court correctly, in our view, decided that it doesn't matter how you make the product if we show that the final product has the three ingredients covered by the claim, an alkaline reacting core, a sub-coating, and an enteric coating in the final product, it does not matter how that product is prepared. Now, Apotex would have you believe that there was some disclaimer or something in the patent that they disclaimed. He also mentioned this concept that they were doing what was disclosed in a prior art patent, 495 patent. Neither of those positions are accurate, Your Honors. The patent does not disclaim in situ formed sub-coating. And Apotex is not practicing the prior art. We detailed in numerous ways in that the Apotex product is different than anything that's disclosed in the 495 patent. Different materials in the core, different processing conditions, different enteric coating materials, and it produces a different product. Similarly, when you look at the patents, there is no example in the patent that is said to be a prior art product, which is similar to what Apotex does. Apotex designed its process to make a specific formulation, and there is a wealth of proof in the record that that formulation, when fully formed at the end of its manufacturing process, includes the claimed sub-coating. A wealth of information on that. AstraZeneca submitted tests using a number of different analytical methods to demonstrate that the sub-coating in the Apotex product met all the limitations of the claim. It was continuous. It was inert. It was disposed between the core and the enteric coating in the final formulation as the claims required. Now, of course, Apotex doesn't like the way the court weighed that evidence, but it's not a claim construction issue. The court did not err in her claim construction. That claim construction is the same one that was found in the first wave, the first Imeprazole case, that was appealed to this court and affirmed. So there's no claim construction issue there. There's an issue there. The issue they've pressed this morning is a claim construction issue, as I understand it. You just think that they're wrong. I think they're wrong. With respect to the claim construction issue. Absolutely. I think they're wrong. And I think the court has already decided that claim construction issue in the first wave. It was affirmed by this court. So it's exactly the same issue that was before this court in the first wave Andrix situation. I'd like to talk a little bit about jurisdiction. Mr. Taylor, before you get to that point, can I ask a question about public use? Absolutely. The issue was reduced to practice, at least from the record, no later than 1983. And then there was testing and testing and testing for three years afterwards, reduced to practice on an experimental basis. How many years does it take for experiments to be maintained in order to establish its efficacy? A year, two years, three years, five years? And still be within the safe harbor provisions of experimenting? Actually, the invention was not reduced to practice. And there's no finding that it was reduced to practice in 1983. Was there, in fact, a finding to the opposite, to the contrary? Absolutely. The court found that it was not reduced to practice. It wasn't ready for patenting because this additional experimentation had not been completed and had not been done. And why was it not reduced to practice? Was it because stability had not been proved? Absolutely. The patent in question deals with two very important and troubling problems with omeprazole. Omeprazole is a highly unstable material. It's unstable in acid, unstable in moisture, heat, a very difficult material to formulate. So it was very difficult. So one problem with omeprazole was getting a formulation that would be stable on the shelf, so to speak, in a bottle. There was a second problem with omeprazole. Because it is acid labile and to be effective it must pass through the stomach, get absorbed by the body and get to the site of action, you had to have a formulation that had gastric acid resistance, what we call stable in the body. So you had the stability on the shelf problem and then you also had the stable in the body problem. That was the enterocoding. The enterocodings helped towards solving that problem, but that was one of the surprising things about this omeprazole formulation, that the enterocoding alone didn't allow AstraZeneca to prepare a product that had sufficient gastric acid resistance to be commercially viable. You needed the alkaline reacting compound. And the subcoating. The subcoating. Subcoating, frankly, surprisingly, a water-soluble or rapidly disintegrating subcoating surprisingly resulted in solving this gastric acid resistance problem. Surely there must have been tests of that composition well in advance of clinical testing. There were in vitro testing, lab testing, not in the body. And the conditions would have simulated the acid content of the stomach, so don't they constitute a reduction of practice? There's no evidence by anyone, Your Honor, that that did. The testimony by the Astra scientists and the Astra inventors were that they had an idea that this thing would work. They believed that it might be a viable option. But until they had the testing, until they had the stability testing, the on-the-shelf testing, and the clinical testing with people with these high amounts of acid in their gastric system to show that it actually worked, you didn't really know whether this worked for its intended purpose. And you can't lose sight of the fact that some of the claims in these patents don't go beyond just the formulation. They go from they're directed to methods of treating gastric acid disorders. Very few pharmaceuticals, whether they're claimed as new compounds or methods of treatment, require clinical testing for reduction of practice. I mean, interferences are one all the time based on in vitro testing and even animal testing, and sometimes even in vitro, which is saying the findings here were different. Findings here were different, and the court clearly found that this invention was not ready for patenting before the critical day. Could you tell us a little bit about the conditions imposed on the participants in the open-label clinical testing? What conditions of confidentiality, if any, were there imposed on the participants? All of the clinicians, of course, signed the clinical protocol, which had conditions of confidentiality in those protocols. The individuals in the clinical trial, the patients, were given these samples, and they didn't know what they were. They didn't know what was in the bottle. They didn't know it was a formulation. They didn't know anything, had no idea, and wouldn't have known that this thing- They didn't know the chemistry involved or the structure. Exactly. And the patients were monitored as to their use of the tablets, the drug. If they did not utilize the volumes that were given to them, they were required to return them. Is it your position that any clinical trial that follows a protocol along the lines that you've just set forth would be a non-public use? It's our position that any clinical trial of an experimental medicine- Well, let's set aside for a moment the experiment part of it. I'm trying to tease apart experimental use from public use. Is it your argument that for whatever reason, suppose that this is being done purely for the purpose of satisfying an FDA requirement, and let's assume that you've already got your drug. Is that a public use, do you think? Well, a lot depends on the details of the use. And what would be the most important detail that would make something a non-public use in a clinical trial setting? That the clinicians are following a protocol that is directed and controlled by the company developing the product, that there are controls over the wide use of this material by the patients, the kind of controls that were in place in the tests that impacts contend were public. These are the way that clinical trials have to be done. So clearly there are circumstances where medicines need to be tested to assess whether they are safe, effective, they have utility. Sure, they do need to be tested. The only question, though, is whether the rules should be such that the company has to apply for a patent before the running of the time after the reduction of practice, or whether this kind of test is just not a public use at all, in which case that clock does not start running. Well, I don't think there needs to be that bright line rule. The laws are already in place. There is a body of case law on what it means to be a public use, and there's a body of case law on what it means to be an experimental use. I think those concepts can just as clearly be applied to the clinical test scenario as they can be to any other set of circumstances. What the cases say, you've got to look at the totality of the circumstances in these public use evaluations to see what is the invention claimed? What are the realities of experimentation in this art? What are the realities? Was there commercial exploitation? Was there some act or action that is at odds with 102B? Clearly in this case there was not. I don't know how clear that is, Mr. Taylor, because in 1982 you knew that the face reformulation, when you added the subcoding, the inert subcoding of the face through formulation was effective. So that's when you started out, wasn't it? That is actually not true, Your Honor. And that fact, as far as I know, is not in the record anyway. It may be in impacts as brief. But I would ask that this court, especially on this issue, look carefully at what is cited in support of some of these broad statements that are in the brief. Testimony on that issue was that there was some indication that the stability problem had been addressed by using this three-layer formulation. You can do an accelerated stability test and you can show that, yeah, it may be stable on the shelf. But the inventors also said they wanted to do long-term stability testing to assess the true stability of the formulation. But what Dr. Carlson from AstraZeneca also said is that you didn't know and you couldn't know whether it worked as a pharmaceutical formulation until you did testing in people. Until people took the sample and you assessed how it worked in the body. You assessed whether gastric acid resistance was, in fact, that problem was, in fact, solved. You assessed whether it was useful for its intended purpose. You didn't know and it wasn't ready for patenting in 1983. Correct me if I'm wrong. Wasn't there some evidence submitted by impacts that was undisputed that there was some bioequivalency testing done outside of the U.S. at that point in time? There was some bioequivalency testing done outside of the U.S. Now, bioequivalency testing is not the kind of testing that we're talking about here. And, of course, that testing was done outside of the U.S. and therefore irrelevant to the public use inquiry. But did Astra know at that particular point in time that the Phase II development was essentially what was being done for Phase III? Back in 1983, there was a Phase II formulation which exhibited increased enteric coding, right, containing enteric code. And they were using the same formulation, basically, for Phase III. Was that different? Absolutely. The Phase II formulation and the Phase III formulation are different. What was the difference? The Phase II formulation doesn't have the subcoding. It's not a material that is covered by the claims in the patents that issue. So all the tests that were done in the Phase II formulation were, frankly, they were clinical trials done on the Phase II formulation. And it was those initial tests that evidenced that the Phase II formulation had this gastric acid resistance problem, that in the body, the gastric acid resistance was not as good as necessary for a viable product. That's what caused the inventors to have to sort of go back to the drawing board to solve that problem. Now, the Phase II formulation solved the on-the-shelf stability problem. It added the alkaline reacting compound to the core, which enhanced the stability of the omeprazole. But it didn't solve the twin problem, the other problem, which was the gastric acid resistance. To get through the stomach successfully. Get through the stomach without degrading. You were about to, I think a little earlier, to turn to the jurisdictional question. Could you address that for us? Yeah. We do believe that the court had jurisdiction to hear this case under 271E4A and B. But you don't even have to address that issue, because the court had also had jurisdiction to continue to hear this case, because Astra has made claims for willful infringement under Section 285 of the patent statutes. So that claim alone meant that there was a lot of controversy that still caused the court to maintain jurisdiction. And we cited the case of GlaxoBase's Apotex in our brief. And in that case, a similar situation happened. Only equitable claims, only equitable remedies sought. Patent expired before trial. The court maintained jurisdiction to decide the case based on dependency of a claim for willful infringement. Does the argument mean that there'd be no such thing as a moot equitable claim, since, for example, there's always an issue of costs? For example, the court might decide that the prevailing party should be given an award of costs. Would that be enough to keep a case from being moot if it's purely an injunctive case, and the event that was triggering the request for injunctive relief had gone away? I haven't looked at that issue. I think that's the implication of your position, if I understand it. Because you're saying there's still money on the table that has to be allocated from one to the other, hypothetically. I think there's a little difference there. 35 U.S.C. Section 285 gives the patentee a right to recover. Right. And 28 U.S.C. 1915, or whatever it is, gives the prevailing party the right to cost. So what's the difference? Maybe right. That's a pretty broad proposition. Well, it's what happened in the Glaxo case with regard to woeful infringement. And back to 271E. Now, there is 271E, 4A, says that the court shall order that the date of approval for an infringer shall not be earlier than the expiration of the patent. So that, on its face, says that this pediatric extension was something that the court could grant after patent expiration. So statute doesn't say that only until the patent expires. It says not earlier. Mr. Taylor, I don't think we'll give you an extension, pediatric or otherwise, so your time has expired. Thank you. Thank you. Mr. Bryce Platt has three minutes. Thank you, Your Honor. As ASTRA conceded in their discussion with this court, one of the purposes behind this patent was to prevent the enteric coating from touching the emerprizol core. The prior court's decision, this court's decision in the first wave, took place before the en banc decision in Phillips. And the en banc decision in Phillips tells us, ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. In the patent, I'm going to only talk about the 505, but the 230 is the same. It says very specifically, ordinary enteric coatings, however, are made of acidic compounds. If covered with such a conventional enteric coating, emerprizol rapidly decomposes by direct or indirect contact with it. That is what the court found Apotex does. It puts its enteric coating directly on an emerprizol core. Under a proper claim construction at that point, there could be no infringement because there is no subcoating as this patent defines it. As preventing the enteric coating from coming in contact with the emerprizol core. All the evidence of trial in this court's finding, the trial court's finding, was that's exactly what Apotex does. It goes on to say, emerprizol rapidly decomposes by direct or indirect contact with the enteric coating. With the result that the preparation becomes badly discovered and loses emerprizol content with the passage of time. I don't know what their expert found, but it clearly was emerprizol. The teaching of this patent is when an emerprizol core touches an enteric coating, it has a reaction where the emerprizol dissipates. That had to be what they found. But we don't have to get into the facts. We go right to claim construction, which is a de novo review, and that is the trial court error when she found that when you put an enteric coating on an emerprizol core, you can possibly have infringement of this patent or the 230 patent. Both of those disavow that. Both of those patents teach the public in any kind of public notice that you don't infringe if you put your enteric coating on your emerprizol core. And that was undisputed. That's exactly what Apotex does. What it said it did in its ANDA. It's what the trial court found. And Judge Rory, just quickly to the question you asked me on the patents. As Astra noted, it's a 226, the 980, and the 815. And I direct the court to pages 42 to 49 of the Apotex opening brief where it discusses anticipation. Thank you. Thank you, Mr. Vice President. Tony has three minutes of rebuttal. Thank you, Your Honor. I'll turn first to the court's questions concerning the public use and the clinical trials that were ongoing of Astra's three-layer formulation. To be clear, it was during phase two that Astra arrived at its three-layer formulation, tested it, and determined that it met stability standards. And it was then in phase three, at the beginning of phase three, they essentially rolled it out. And all of the phase three clinical trials were conducted with a dosage form that included all three layers. And the district court below found that that phase three formulation did, in fact, infringe the patents. They did, in fact, embody all the limitations of the claims. Now, with respect to Mr. Taylor's arguments in a couple of respects, as of the critical date, In fact, as of the clinical trials that we specify in our brief, specifically the one labeled I-403, the following was known about Astra's formulation. It had passed stability standards. Their scientists determined it was bioequivalent. Now, granted, that bioequivalence and some of the clinical trials that used the phase three formulation did occur outside the United States. But this court has never required that reduction to practice occur here, only the public use occur here. And that was a way in which they determined that they had reduced their invention to practice. It actually worked. As of the beginning of this trial, I-403, thousands of patients had been treated in phase three clinical trials in Europe and shown that the omeprazole drug formulation was effective to treat gastric disease. It passed stability tests even in the United States. It proved to be shelf-stable. It proved to be body-stable in that it was effective to treat disease. And hundreds of patients in the United States had been treated. All of that had occurred as of the time this phase three clinical trial, I-403, commenced. But the court did find that the reduction of practice did not take place until 1986, though. Yes, Your Honor, at least insofar as the court found that ongoing experimentation was underway. Now, is that a question of fact or a question of law or otherwise? I think it's both. The question of the purpose of the experimentation is certainly a question of fact. In that respect, I submit that she clearly erred by finding that these clinical trials were gauged to determine the stability of the formulation, which is what this patent is directed to. Those were instead to see, for example, this particular phase three clinical trial. Was this formulation already proved to be effective to treat gastric disease? Was it effective for new indications? What is it that, in your view, makes this clinical trial a public use? Put another way, what would I have to do in order to avoid triggering the public use in conducting a clinical trial, even if I'd already reduced to practice? There are two lines of cases. In vitrogen, the BioQuest case essentially says if the purpose of the use is to gain a commercial advantage, that's not experimental. Whatever gain a commercial advantage means is a little unclear to me. But I'd like a little more specific help. Let me put the question this way. Suppose I have already reduced a drug to practice in my home lab. And I come in and I tell my law clerks, here, try the drug. And indeed, they do fine with it. So I say to all the law clerks around the court, try the drug. Have I made public use? If I tell each of them, don't spread this around. This is just our own little arrangement here. Well, it would depend on the claims of the patent, Your Honor. I mean, in this case, the experimentation this court has held, the experimentation. This isn't experimental. I've already reduced to practice. I'm just doing this for the amusement of everyone involved. Well, I would suggest that. My question is, is it public use if it's done on a quasi, at least, private basis? I'm sure your chambers are, in fact, private. And I would suggest that if it is, in fact, contained, total control maintained, and it's not for purposes of gaining a commercial advantage, then that's not a public use. But even here, the district court found there was public disclosure. In fact, in her opinion, she found specifically that plaintiff's clinical trials resulted in some public disclosure of the inventions at issue because they were, in fact, open-label trials. This particular one, I-403, was open-label. The patients knew they were getting Omeprazole. And Astra certainly knew that the formulation by then was stable. They were just looking to see if they could get more indications to put on their label in front of the FDA. And that was the purpose of the trial. We learn something about our colleagues every day. Thank you, Mr. Toney. Your Honor. Time has expired. We'll take the case under advisement.